UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| PRO TRAK INTERNATIONAL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. C-05-342-JM |
| | ) | |
| PROTRACKER SOFTWARE, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION…………………………………………………………………..  1

  A.  Factual Background……………………………………………………………  1

I.  ARGUMENT……………………………………………………………………  4

A.  The Law of Summary Judgment …………………………………………  4

  B.  The Plaintiff's Unreasonable, Inexcusable Delay in Bringing This Suit and
     the Resulting Severe Prejudice to Defendant Bars Plaintiff From Any Relief…5

    1. The Doctrine of Laches …………………………………………………  5

    2. Plaintiff Knew or Should Have Known of the Alleged Infringement in
      July 1998, SEVEN Years Before Filing Suit………………………………  6

    3. Plaintiff Has No Excuse for Delaying Taking Any Action for Seven (7)
      Years From When It Knew or Should Have Known of the Alledged
      Infringement……………………………………………………………… 7

    4. Defendant Would Be Severely Prejudiced If Plaintiff Were Allowed
      Now To Enforce its Purported Rights………………………………..….. 7

  C.  There Is No Likelihood Of Confusion Between the Parties' Names
     and Marks……………………………………………………………………9

    1. The Parties' Goods Are Very Different……………………………………  10

    2. Channels Of Trade, Advertising, And Class Of Prospective Purchasers…… 13

    3. Evidence of Actual Confusion……………………………………………  17

    4. Intent In Adopting The Mark……………………………………………  19

    5. Strength Of Mark………………………………………………………  20

    6. The Marks Are Different…………………………………………………  21

  D.  Pro Trak's Asserted U.S. Reg. No. 1,835,278 Should Be Cancelled…………  22

II.  CONCLUSION………………………………………………………………… 25

# TABLE OF AUTHORITIES

**Cases**

*AFL-CIO v. Winship Green Nursing Center*, 103 F.3d 196, 200 (1st Cir. 1996)............................ 9

*Aktiebolaget Electrolux v. Armatron Int'l, Inc.*, 999 F.2d 1, 5-6 (1st Cir. 1993) .............. 10, 13, 18

*American Steel Foundries v. Robertson*, 269 U.S. 372 (1926)................................................. 9, 23

*Anderson v. Board of Regents of the Univ. of Wisconsin Sys.*, 140 F.3d 704 (7th Cir. 1998)......... 5

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ......................................................... 4, 5

*Anheuser-Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 320 (4th Cir. 1992)............................ 13

*Ayala-Gerena v. Bristol Myers-Squibb Co.*, 95 F.3d 86, 94 (1st Cir. 1996) ................................... 4

*Bridgestone/Firestone Research, Inc. v. Auto. Club de l'Ouest de la France*, 245 F.3d 1359, 1362, 1364 (Fed. Cir. 2001)........................................................................................................ 5

*Carroll v. Xerox Corp.*, 294 F.3d 231, 236-237 (1st Cir. 2002)..................................................... 5

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ...................................................................... 4

*E-Systems, Inc. v. Monitek, Inc.*, 720 F.2d 604, 607 (9th Cir. 1983)........................................... 5, 7

*Greenlon, Inc. of Cincinnati v. Greenlawn, Inc.*, 542 F. Supp. 890, 893 (S.D. Ohio 1982) ........ 23

*Irwin v. Dept. of Veteran Affairs*, 498 U.S. 89, 92 (Dec. 1990) ................................................. 6, 7

*Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 377 (1st Cir. 1980) ...................................... 18

*Link v. Wabash Railroad Co.*, 370 U.S. 626, 634 (June 1962)....................................................... 6

*Marshak v. Green*, 746 F.2d 927, 929 (2nd Cir. 1984) ................................................................ 23

*Miller v. Glenn Miller Productions, Inc.*, 2006 U.S. App. LEXIS 18072 ...................................... 5

*New Era Publications Int'l v. Henry Holt & Co.*, 873 F.2d 576, 584-85 (2d Cir. 1989)............... 5

*Pignons S.A. De Mecanique De Precision v. Polaroid Corp.*, 657 F.2d 482, 487 (1st Cir. 1981)....................................................................................................................... 18, 21

*Sanchez v. Oregon*, 126 S. Ct. 2669, 2686 (June 2006) ................................................................ 6

*Societe des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 641 (1st Cir. 1992) .......... 9

*Star Fin. Servs., Inc. v. AASTAR Mortgage Corp.*, 89 F.3d 5, 10 (1st Cir.) .................................... 9

*Stone v. Williams*, 873 F.2d 620, 624 (2d Cir. 1989) ...................................................................... 9

*Tandy Corp. v. Malone & Hyde, Inc.*, 769 F.2d 362, 366 (6th Cir. 1985) ....................................... 5

*The International Association of Machinists and Aerospace Workers, AFL-CIO v. Winship Green Nursing Center*, 103 F.3d 196, 200 (1st Cir. 1996) ................................................... 9, 10, 18

*The Joint Stock Society v. The Russian American Spirits Co.*, 53 F. Supp. 2d 692 (D. Del. 1999) 8

*United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90 (1928) ................................................. 23

**<u>Rules</u>**

Fed. R. Civ. P. 56(c) ...................................................................................................................... 4

**<u>Statutes</u>**

*15 U.S.C. §1060* ............................................................................................................................ 23

*15 U.S.C. §1119* ............................................................................................................................ 25

## INTRODUCTION

This is a trademark infringement case. Summary judgment should be granted in favor of Defendant ProTracker Software, Inc. ("Defendant") on three issues: (1) Plaintiff's inexcusable delay and the resulting severe prejudice to Defendant bars Plaintiff from obtaining any relief in the case; (2) there is no likelihood of confusion between the parties' names and marks; and (3) the federal trademark registration asserted by Plaintiff is invalid and should be cancelled.

Plaintiff waited seven (7) years before bringing suit, a delay that would severely prejudice Defendant if Defendant were now ordered to change its name and marks. Additionally, there is no likelihood of confusion because the parties use different marks, have different products, market to different potential customers, and use different channels of trade. Further, there has been no, or at most *de minimis*, actual confusion during the nine (9) years of concurrent use of the marks. Finally, the federal trademark registration asserted by Plaintiff is invalid, as there was no goodwill associated with the mark when assigned to Plaintiff and the registration should be cancelled.

### A.    Factual Background

Defendant was created by Warren Mackensen, a Certified Financial Planner (CFP), in the mid-1990's when he was looking for a better way to manage his own financial planning business. SMF 2[1]. In particular, he wanted software that would automate repetitive tasks, track work flow processes, perform calculations and enable others in his office to track the status of matters and to remind them when they should do something for a client. SMF 4. Mr. Mackensen learned there was no such product available and took the initiative to develop his own practice management software. SMF 4. In 1996, Mr. Mackensen demonstrated his software at a financial

---

[1] "SMF___" refers to the relevant paragraph number in Defendant's Statement of Material Facts In Support of Its Motion For Summary Judgment, filed contemporaneously herewith.

planners conference, encouraging other financial planners to develop similar software. SMF 5.

Instead, they clamored to purchase his software. SMF 5. In 1997, after much thought, Mr.

Mackensen incorporated ProTracker Software, Inc., to develop, market and license

PROTRACKER SYSTEM, his software for personal financial advisors. SMF 6.

   ProTracker Software, Inc., was based out of Mr. Mackensen's house for the first three

years of its existence. SMF 8. Although now moved out of Mr. Mackensen's house, Defendant

still operate as a small New Hampshire-based company with just three full-time employees. SMF

1. Over time, Defendant has expanded its business to offer several products for financial

planners, such as PROTRACKER Compliance Manual and PROTRACKER Business Continuity

Plan, with the core product remaining the practice management tool developed ten (10) years

ago. SMF 9. All Defendant's products are for personal financial advisors. SMF 9-10. Defendant

has plans to release additional software for personal financial advisors in the near future. SMF 9.

   Since 1997, Defendant built up and established its business and reputation, spending

considerable effort, resources and money to do so. SMF 15, 56. Defendant attended numerous

conferences across the country, gave lectures, ran booths at trade shows, marketed and advertised

its products, all to promote its name, mark and products. SMF 12-15.

   PROTRACKER SYSTEM was enhanced and improved, and Defendant changed the

name to PROTRACKER ADVANTAGE in 2003, using a laudatory term in the product name to

tout a new graphical user interface and the benefits that the product provides to its users. SMF

18. The U. S. Trademark Office determined that the mark was unique and not likely to cause

confusion with any other registered mark or pending application and awarded Defendant U.S.

Trademark Reg. No. 3,038,202 for the mark PROTRACKER ADVANTAGE. SMF 21.

Defendant has always focused its product line and product marketing to a very narrow market - personal financial advisors. SMF 10. These personal financial advisors are typically self-employed or working in a small office of, on average, three users. SMF 10. The personal financial advisors may be independent or part of a larger organization, but all of the users of the Defendant's products service clients comprising individual retail clients, typically a single person, a couple or sometimes, a family. SMF 10.

Defendant's PROTRACKER ADVANTAGE practice management software provides its users with a comprehensive tool to manage their entire practice, guiding them through many pre-programmed tasks personal financial advisors should engage in when servicing clients. SMF 31. PROTRACKER ADVANTAGE provides the necessary forms, timetables, calculations and reports for a personal financial advisor, enabling the user to effectively run a personal financial advising practice without having to create anything himself. SMF 31-32.

Defendant's product is unique. There is only one other product that performs similar tasks to Defendant's PROTRACKER ADVANTAGE product, "Junxure," sold by a third party. SMF 35. PROTRACKER ADVANTAGE and Junxure are the only available products that target the personal financial advisor practice management market by providing a comprehensive industry-specific practice management tool. SMF 35.

Plaintiff Pro Trak International, Inc. ("Plaintiff") is a New York-based corporation that licenses customer relationship management ("CRM") software to institutional investment clients. SMF 22. One of the primary features of Plaintiff's product is that it downloads and integrates third-party data about potential customers. SMF 38. This data is used to solicit new business and manage their relationships with existing customers. SMF 38. Plaintiff's product does not include pre-programmed tasks for managing a personal financial advising practice, and does not provide

the forms, timetables, calculations or reports for a personal financial advisor needs to manage a personal financial advising practice. SMF 39. Thus, personal financial advisors would not select Plaintiff's product to manage their personal financial advising practice. In fact, <u>no</u> personal financial advisor has <u>ever</u> purchased Plaintiff's product. SMF 41.

Although Defendant has been openly and widely using its name and marks since May 1997, Plaintiff did not contact Defendant to complain of Defendant's use of its name and marks until June 2005. SMF 55. As set forth below in more detail, Plaintiff knew of Defendant, its products and its name and marks as early as July 1998. SMF 24. At that time, Plaintiff obtained through its attorney a trademark search report disclosing the existence of Defendant and its marks. SMF 24. Despite having at least constructive knowledge of Defendant and its marks, Plaintiff did nothing for <u>seven</u> (7) years. SMF 24-25.

## I.      <u>ARGUMENT</u>

### A.      <u>The Law of Summary Judgment</u>

Summary judgment should be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists where a fact that may affect the outcome of the suit may be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The moving party must identify the portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex* 477 U.S. at 323. The opposing party then has the burden to "produce evidence on which a reasonable finder of fact, under the appropriate proof burden, could base a verdict for it; if the party cannot produce such evidence, the motion must be granted." *Ayala-Gerena v. Bristol Myers-Squibb Co.*, 95 F.3d 86, 94 (1st Cir. 1996) (*citing Celotex*, 477 U.S. at 323; *Anderson*, 477 U.S. at 249). All

4

reasonable and justifiable inferences must be drawn in the light most favorable to the opposing

party and any doubt must be resolved against the moving party. *Anderson*, 477 U.S. at 255.

Summary judgment cannot be defeated by conclusory allegations, improbable inferences, or

unsupported speculation. *Carroll v. Xerox Corp*., 294 F.3d 231, 236-237 (1st Cir. 2002).

**B.**     **The Plaintiff's Unreasonable, Inexcusable Delay in Bringing This Suit and the**
          **Resulting Severe Prejudice to Defendant Bars Plaintiff From Any Relief**

    **1.**     **The Doctrine of Laches**

The doctrine of laches bars enforcement of a plaintiff's rights when it has unreasonably

delayed their assertion so as to cause prejudice to the opposing party. *Anderson v. Board of*

*Regents of the Univ. of Wisconsin Sys.*, 140 F.3d 704 (7th Cir. 1998). In the context of a

trademark case, laches may be applied to bar both injunctive relief and damages. *See Tandy*

*Corp. v. Malone & Hyde, Inc.*, 769 F.2d 362, 366 (6th Cir. 1985). To prove the defense of laches,

the defendant must show that (1) plaintiff knew or should have known of the allegedly infringing

activity; (2) plaintiff inexcusably delayed in taking action; and (3) defendant would be

prejudiced if plaintiff were now allowed to belatedly assert its alleged rights. *New Era*

*Publications Int'l v. Henry Holt & Co.,* 873 F.2d 576, 584-85 (2d Cir. 1989) (laches barred

plaintiff from enjoining publication of biography when there was severe prejudice and

unconscionable delay in seeking relief); *Miller v. Glenn Miller Productions, Inc.*, 2006 U.S. App.

LEXIS 18072 (Plaintiff who "should have known" of defendant's allegedly infringing activity is

deemed to have constructive knowledge); *see also E-Systems, Inc. v. Monitek, Inc.*, 720 F.2d

604, 607 (9th Cir. 1983) (laches barred trademark infringement even though the plaintiff did not

have actual knowledge of the defendant's activities until the year of suit, as the plaintiff should

have discovered defendant's use sooner); *Bridgestone/Firestone Research, Inc. v. Auto. Club de*

*l'Ouest de la France*, 245 F.3d 1359, 1362, 1364 (Fed. Cir. 2001) (petition for cancellation of a

registered trademark was barred by the doctrine of laches based on the petitioner's constructive knowledge); 5 J. McCarthy, on Trademarks § 31:38 (4rd ed. 1996) (laches requires determining when the plaintiff was "actually or constructively on notice of defendant's activities").

2.    **Plaintiff Knew or Should Have Known of the Alleged Infringement in July 1998, SEVEN Years Before Filing Suit**

Plaintiff had at least constructive knowledge of the existence of Defendant and its use of its names and marks at least as early as July 1998. Plaintiff through its attorney, Ralph Wood, conducted a full trademark availability search for the mark PROTRAK for the goods "computer software" in July 1998. SMF 24. Plaintiff's attorney received and kept a copy of the report covering a variety of sources, including Trademark Office records. SMF 24. Defendant had applied for a trademark registration for the mark PROTRACKER SYSTEM in 1997, and therefore, Defendant's name, applied-for mark, and details surrounding Defendant's application were in the Trademark Office database and included in the search report. SMF 24. Plaintiff's attorney reviewed and maintained the search report, and thus had notice and at least constructive knowledge of Defendant. SMF 24. In fact, Plaintiff used this search report to gather information about, Marmen Computing, Inc. ("Marmen") who owned a trademark registration for the mark PROTRAK. SMF 25. Plaintiff sought an assignment of the mark PROTRAK and the registration thereof. SMF 26.

Whether Plaintiff itself reviewed the report and had seen Defendant's information in the report does not matter, for the knowledge of its attorney, its agent, is imputed to Plaintiff. *See Sanchez v. Oregon*, 126 S. Ct. 2669, 2686 (June 2006) (an attorney's actions or omissions are imputed to the client); *Irwin v. Dept. of Veteran Affairs*, 498 U.S. 89, 92 (Dec. 1990); *Link v. Wabash Railroad Co.*, 370 U.S. 626, 634 (June 1962). Despite knowing about Defendant's existence and its use of the names and marks PROTRACKER, PROTRACKER SOFTWARE

6

and PROTRACKER SYSTEM since July 1998, Plaintiff inexcusably failed to take any action until June 2005, over seven (7) years later.

### 3. Plaintiff Has No Excuse for Delaying Taking Any Action for Seven (7) Years From When It Knew or Should Have Known of the Alleged Infringement

Despite its knowledge of Defendant and its alleged infringement since July 1998, Plaintiff did nothing for seven (7) years, until June 2005, when it sent a letter to Defendant. SMF 55. The only excuse Plaintiff can offer for this unreasonable delay is that it did not have actual knowledge of Defendant or its alleged infringement.[2]

As discussed above, Plaintiff had notice and at least constructive knowledge and that is all the law requires. *E-systems*, 720 F.2d at 607. The undisputed fact is that Plaintiff's lawyer, at Plaintiff's instruction, ordered and obtained a full trademark search report, which fully identified Defendant and its activities. SMF 24. The search report was studied by Plaintiff's attorney/agent, and knowledge of its contents is imputed to Plaintiff. *Irwin*, 498 U.S. at 92.

### 4. Defendant Would Be Severely Prejudiced If Plaintiff Were Allowed Now To Enforce its Purported Rights

During the seven (7) years that Defendant existed and operated with Plaintiff's knowledge, Defendant developed a significant market for its company and its product. SMF 12. Defendant advertised and became well known throughout the personal financial advisor community. SMF 15. Since 1997, Defendant spent considerable resources developing its stellar reputation and goodwill. SMF 15. Mr. Mackensen traveled around the country giving presentations for Defendant at trade shows and conferences customarily attended by personal financial advisors, presenting at as many as ten trade shows per year. SMF 12. Defendant advertised in the trade journal *NAPFA Advisor*. SMF 13. In 1998, Defendant established, and has

---

[2] If that is Plaintiff's excuse, it shows that there is no likelihood of confusion, because Plaintiff allegedly was not aware of Defendant for eight (8) years of continuous, concurrent uses of the parties' respective names and marks. Within that entire time, there were no confused customers that brought Defendant to Plaintiff's attention.

continuously updated, a very robust and user-friendly web site at www.protracker.com. SMF 14. Defendant spent a significant amount of time and money marketing its names and marks to its potential customers. SMF 56. Defendant's entire identity, its very ability to survive, is now tied to the use of its names and marks it has developed since 1997. SMF 17. If Defendant were forced to change its names and marks, Defendant's customers and potential customers would likely believe Defendant had gone out of business, and would not purchase any additional goods or services from Defendant, resulting in the likely end of Defendant's business. SMF 17. This is an extremely severe prejudice Defendant would suffer as a result of Plaintiff sitting on its purported rights for seven years.

Both monetary damages[3] and an injunction would severely and unfairly prejudice Defendant, especially because of Plaintiff's inexcusable and unreasonable delay of seven (7) years. Laches serves to bar both monetary and injunctive relief in the face of an inexcusable delay in bringing suit that results in severe prejudice to the defendant. *The Joint Stock Society v. The Russian American Spirits Co.*, 53 F. Supp. 2d 692 (D. Del. 1999). Defendant is very small, with only three (3) full-time employees. SMF. During the seven (7) year period when Plaintiff knew of Defendant, but did nothing, Plaintiff sat back and allowed Defendant to spend its meager resources developing its name, goodwill and positive reputation within the community. Plaintiff has created a situation where Defendant would be severely prejudiced if it were now to be required to stop using its marks PROTRACKER, PROTRACKER.COM, and PROTRACKER ADVANTAGE.

The purpose of the laches doctrine is to not reward a party that sits on its purported rights. Granting an injunction in this case would wrongfully reward Plaintiff for doing nothing for seven

---

[3] Here, Plaintiff admits that it has not been damaged as a result of Defendant's use of its name and mark. SMF. Thus, there are no monetary damages to award.

(7) years. The longer the delay without a good reason, the less prejudice to the Defendant that needs to be demonstrated. *Stone v. Williams*, 873 F.2d 620, 624 (2d Cir. 1989) (laches was granted where a delay for six years without a reason required defendants to show little prejudice). Here, the Plaintiff delayed without any reason for seven (7) years, resulting in an extreme prejudice to the Defendant.

This Court should bar both monetary and injunctive relief to Plaintiff because of Plaintiff's inexcusable and unreasonable delay and severe prejudice suffered by Defendant if Plaintiff could now assert its purported rights. Because of Plaintiff's laches, summary judgment on each count of the Amended Complaint should be entered in favor of Defendant, barring any and all relief to Plaintiff.

**C.    There Is No Likelihood Of Confusion Between the Parties' Names and Marks**

The Lanham Act provides that the unauthorized use of a trademark occurs when the particular usage causes a likelihood of confusion with respect to the identity of the trademark owner. *The International Association of Machinists and Aerospace Workers, AFL-CIO v. Winship Green Nursing Center*, 103 F.3d 196, 200 (1st Cir. 1996); *see also Societe des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 641 (1st Cir. 1992) (explaining that only those trademarks that are likely to cause confusion are prohibited). Likelihood of confusion is typically the dispositive inquiry in a Lanham Act case. *Id*. Plaintiff's state law claims mirror the Lanham Act claims and can be ruled upon in favor of Defendant for the same reasons set forth herein.

To prove likelihood of confusion, a trademark owner "must show more than the theoretical possibility of confusion." *Int'l Ass'n of Machinists* 103 F.3d at 200; *see also American Steel Foundries v. Robertson*, 269 U.S. 372, 382 (1926) (requiring probable confusion); *Star Fin. Servs., Inc. v. AASTAR Mortgage Corp.*, 89 F.3d 5, 10 (1st Cir.) (requiring

evidence of a substantial likelihood of confusion); 3 J. McCarthy, McCarthy on Trademarks and

Unfair Competition §23.01[3][a] (4rd ed. 1996). When assessing likelihood of confusion, eight

factors are considered and analyzed in the First Circuit: (1) the similarity of the goods; (2) the

relationship between the parties channels of trade; (3) the juxtaposition of their advertising; (4)

the classes of prospective purchasers; (5) the evidence of actual confusion; (6) the defendant's

intent in adopting its allegedly infringing mark; (7) the strength of the plaintiff's mark; and (8)

the similarity of the marks. *Aktiebolaget Electrolux v. Armatron Int'l, Inc.*, 999 F.2d 1, 5-6 (1st

Cir. 1993); *Int'l Ass'n of Machinists*, 103 F.3d at 201. Typically, factors two through four are

treated together. *Aktiebolaget*, 999 F.2d at 5.

In analyzing the eight factors for determining likelihood of confusion, no one individual

factor is determinative. *Int'l Ass'n of Machinists*, 103 F.3d at 201. Rather, each factor must be

carefully considered and appropriately weighed. *Aktiebolaget*, 999 F.2d at 4-5. Each factor, as

analyzed below, and the overall cumulative effect of the analysis, conclusively demonstrates that

there is no likelihood of confusion between the parties' respective names and marks.

### 1.     The Parties' Goods Are Very Different

The parties' goods are very different. Defendant's product is a practice management

product for personal financial advisors. SMF 9. A "personal financial advisor" is one who

advises and services an individual client (typically an individual person, a married couple or

sometimes a family unit). SMF 10. This is different from Plaintiff's customers, who are

"institutional" investment advisors who advise mutual funds, hedge funds, and endowments,

such as for universities and the like. SMF 23. Plaintiff does not have <u>any</u> customers who are

personal financial advisors. SMF 41. Another major difference between the two types of advisors

is the amount of money managed. The typical personal financial advisor might have an average

of $100 million of assets under management; the typical institutional investment advisor often will have billions of dollars in assets under management. SMF 11, 23. The tasks each type of advisor needs to undertake to service their respective clients are very different. SMF 31.

Defendant's product provides a personal financial advisor with all of the tools necessary to run a successful personal financial advising practice. SMF 31. The software, as licensed, out-of-the-box, is completely ready for a personal financial advisor to use to run his practice. SMF 31-33. The product includes all of the tasks, tables and information aggregation needed for effective practice management. SMF 31. Additionally, Defendant's product includes a series of pre-created standard reports for practice management, including client management and reports that may be needed for example, during a U. S. Securities and Exchange Commission ("SEC") audit. SMF 31-32.

Defendant's product also performs various calculations needed, to service clients who are individuals, such as those necessary to determine net worth, withdrawal rate, and Required Minimum Distributions ("RMDs"). SMF 31. For example, RMDs are distributions the federal government requires investors take from IRAs, 401(k) plans and the like when the investor reaches age 70½. SMF 31. It is important to take an RMD, or there are significant adverse tax consequences to the investor. SMF 31. Some investors, desire to minimize the amount they take each year as a distribution, maximizing what they can pass on to their heirs. RMD calculations are only necessary for individual investors. SMF 31. RMDs have no impact on institutional investors, as they are not subject to any such distribution rules. SMF 31.

Plaintiff's product, on the other hand, is customer relationship management software for institutional investors. SMF 22. As noted, institutional investors include investment companies that manage large-scale investments for institutional investors, such as pension or 401(k) fund

programs. SMF 23. One of the main selling points of Plaintiff's products is that it manages third-party directory information. SMF. Various third parties, such as Standard & Poor's Money Market Directory of Pension Funds, and Nelson's Plan Sponsors / Consultants, provide information about institutional investors, including contact information, amount of money available to be managed, and other information that would enable a money manager to make a sales pitch to the institutional investor. SMF 38. This information may be downloaded using Plaintiff's product from electronic service providers and imported into Plaintiff's product. SMF 38. Plaintiff's product provides a sophisticated level of customer relationship management features, making it a very good contact manager. SMF 38. It allows a user to track contact communications, whether email, phone logs, letters, or the like, that the user had with a contact. SMF 38. It is also customizable, either by Plaintiff or its users, to perform various tasks. SMF 40.

What Plaintiff's product cannot do, however, is provide practice management for personal financial advisors to enable a user to run a personal financial advisor's office as Defendant's product does. SMF 39. In fact, <u>no</u> personal financial advisors have used Plaintiff's product to set up and run their practice. SMF 41. Plaintiff's product has no pre-programmed tasks, it has very few pre-formatted reports, and does no calculations of interest to the personal financial advisor. SMF 31. For example, Plaintiff's product does not calculate net worth, withdrawal rate or RMDs. SMF 39. It does not have pre-formatted reports that a personal financial advisor must provide to the SEC during an audit. SMF 39. It is not a product that any personal financial advisor would want to use to mange their practice, as Defendant's product is.

Plaintiff's product is apparently customizable. SMF 40. Plaintiff asserts that it or its users could change Plaintiff's product to provide the functionality offered by Defendant's product. SMF 40. However, this is irrelevant. First, it would be very burdensome to make the changes in

Plaintiff's product to provide the functionality already available in Defendant's product. Second, the level of expertise required to make such changes is far beyond most users. Third, prospective customers would not pay for such changes to force Plaintiff's product to do what Defendant's product does out-of-the-box. Fourth, as a matter of law, that is not relevant, because the test for the similarity of the products is as-sold, not how one of the products could be modified to make it more like the other. *Anheuser-Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 320 (4th Cir. 1992) (must look at the product as-sold in the marketplace).

While Plaintiff now asserts that Defendant is a competitor, the reality is otherwise. The only product that is truly a competitor to Defendant, Junxure, is not considered by Plaintiff to be competitive with Plaintiff's product. SMF 35. If Defendant's competitor is not a competitor of Plaintiff, then logically, Defendant cannot possibly be a competitor of Plaintiff either. Further, Plaintiff asserts in litigation that it was not aware of Defendant until late 2004. SMF 24a. If that is the case, then how could the parties be competitors, and Plaintiff did not even know of Defendant for seven years?

Because of these significant differences between the goods, this factor weighs heavily in favor of Defendant.

**2.      Channels Of Trade, Advertising, And Class Of Prospective Purchasers**

The channels of trade, advertising, and class of prospective purchasers are all interrelated and thus are typically analyzed together in the First Circuit. *See e.g. Id.* at 488; *Aktiebolaget*, 999 F.2d at 5. Significant differences exist between the channels of trade, relationship of advertising, and prospective purchasers of the parties. This only makes sense, as the parties' products themselves are so different. As noted above, Plaintiff's product is targeted to institutional investors such as companies running pension, 401(k), or hedge funds. SMF 22-23. No personal

financial advisors have used Plaintiff's product to set up and run their practice. SMF 41.

Plaintiff's product is a CRM product designed to help the user manage information about

contacts. SMF 38. Defendant's product, on the other hand, is targeted to personal financial

advisors whose clients are individual investors. SMF 10. The purpose of Defendant's product is

to streamline and increase the efficiency of the overall practice management for personal

financial advisors. SMF 34. Defendant has never sold its product to institutional money

managers such as companies operating hedge funds, pensions or 401(k) funds.

　　　The parties market and advertise to very different groups of potential consumers, as very

different groups of potential consumers will want to purchase their respective products, because

the products perform such different functions. Defendant markets to personal financial advisors.

Defendant's most significant marketing vehicle is through the National Association of Personal

Financial Advisors ("NAPFA") and the Financial Planning Association ("FPA") conferences and

trade shows, where Defendant makes presentations and has exhibits and booths promoting its

products. SMF 12. Plaintiff, on the other hand has never exhibited at nor ever considered

exhibiting at a NAPFA or FPA conference. SMF 29. Plaintiff markets its product to institutional

investors. SMF. When Plaintiff does attend conferences, it attends conferences sponsored by the

Association of Investment Management Sales Executives ("AIMSE") and the Professional

Association for Investment Communication Resources ("PAICR"). SMF 29. Defendant has

never attended nor considered attending an AIMSE or PAICR conference. SMF 12. Not

surprisingly, the parties have never appeared at the same trade show. SMF 29.

　　　Defendant occasionally advertises in *NAPFA Advisor*, a trade journal aimed at personal

financial planners, and obtains positive third-party reviews and word of mouth. SMF 13.

Defendant has never used or considered using a direct mail or email marketing program. SMF

13. Defendant relies heavily on its web site to disseminate information about itself including demos showing details of how its products work. SMF 14. Defendant has never purchased keyword ads from Google® or other search engines. SMF 13.

Plaintiff uses different advertising and marketing methods than Defendant. Plaintiff primarily markets through Internet advertising, purchasing Google® keyword ads, and engaging in significant direct mail and e-mail programs several times each year. SMF 28.

The purchasers of the parties' respective products are sophisticated customers who will conduct a significant amount of research when determining whether to purchase one of the parties' products. The products are not impulse items purchased in the checkout line at the grocery store. Typically, each party's prospective customer will have many conversations with the party prior to purchasing the product, attempting to ascertain the potential uses and advantages of the product and how it may integrate into their business. SMF 42. This is especially true for Plaintiff, whose product is significantly customizable, unlike Defendant's product, which is far less customizable. SMF 40. Additionally, Plaintiff uses a web-based demo that works live in real-time with a Plaintiff sales representative, explaining the uses and functionality of Plaintiff's software. SMF 42. Potential customers of each party will clearly understand the product and its source through these conversations and demonstrations.

Both products are expensive, further causing potential customers to be very careful when making their purchasing decisions. Additionally, there is a great difference in price between the parties' respective products. Plaintiff's product is far more expensive than Defendant's product. The current license fee for Plaintiff's product for five users is $33,500, or about $6,700 per user. SMF 43. The current license fee for Defendant's product is $900 for the first user and $450 for

each additional user within the same office thereafter. SMF 36. Thus, for five users, Defendant's product would cost $2,700, less than one-twelfth the price of Plaintiff's product. SMF 36, 43.

Any customer who may spend thousands of dollars on software will approach the decision very carefully, investigating all aspects of the product and its source. Indeed, Plaintiff fields calls from up to three or more persons within a potential customer's organization prior to purchase. SMF 42. An assistant may make the initial contact, next a potential user, followed by someone from the potential customer's Information Technology (IT) department. SMF 42. On the other hand, many of Defendant's customers are very small businesses that do not even have an IT department. SMF 10. The personal financial advisor himself will call Defendant to investigate. SMF 17.

Because Defendant's product is intended to manage the practice of its users, the personal financial advisor, these potential customers will proceed very cautiously and carefully before making a purchase decision. SMF 17. Defendant's potential customers are far more cost conscious than Plaintiff's potential customers, and are very reluctant to pay even the lower price Defendant charges. SMF 36. If they were being charged close to the $6,700 per user of Plaintiff's customers, Defendant's customers would not purchase the product. SMF 36. Thus, Defendant's potential customers would be very aware of who they were dealing with based on the price of the respective products.

To actually obtain a copy of Plaintiff's product, the licensee must sign a written agreement. SMF 44. Plaintiff's agreement specifically identifies the parties to the agreement, including Plaintiff as the licensor. SMF 44. Any issue as to source of the product would certainly have been clarified by the time a potential customer signed the agreement.

Thus, the major differences between the parties' respective channels of trade, means and methods of advertising, and class of prospective purchasers weigh heavily in favor of Defendant. The two companies market to very different classes of purchasers, as evidenced by the types of marketing and advertising conducted, the trade shows and conferences attended, and the vastly different price range of the two software systems. This factor weighs in favor of Defendant.

### 3.    Evidence Of Actual Confusion

During the now nine (9) years of concurrent use by the parties of their respective names and marks, there is at most only one (1) example of alleged actual confusion. SMF 53a. Further, this "one example" is not even an example of actual confusion, but rather, of a party who knew exactly with whom he was speaking but made a clerical mistake. Mr. David Andera attended a conference at which Defendant gave a presentation. SMF 52. Several months after the conference, he sought to gather additional information about the Defendant's product. SMF 52. He apparently did not have Defendant's phone number and mistakenly obtained Plaintiff's number. SMF 52. In a conversation with Plaintiff's sales representative, he told Plaintiff that he wanted to talk to the New Hampshire company. SMF 52. Once he learned of the price of Plaintiff's product, he ended the conversation. SMF 52. The following month, Mr. Andera then called Defendant. SMF 53. In that conversation, he mentioned to Defendant's representative that there was a company called "ProTrak." SMF 53. This shows that Mr. Andera was not confused and knew exactly with whom he was speaking. He was fully aware that Plaintiff and Defendant are not in any way affiliated and were located in different states. He simply made a clerical error when obtaining the phone number.

A demonstration of actual confusion is not necessary to show likelihood of confusion, but "weak evidence of actual confusion weighs quite heavily against a finding of likelihood of

confusion." *Aktiebolaget*, 999 F.2d at 7. An absence or negligible amount of actual confusion "between two products after a long period of coexistence on the market is highly probative in showing that little likelihood of confusion exists." *Id.* (coexistence for six years with little actual confusion was convincing that there was no likelihood of confusion); *see also Pignons*, 657 F.3d at 490 (coexistence for four years with little actual confusion was convincing that there was no likelihood of confusion); *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 377 (1st Cir. 1980) (coexistence for three and a half years with no actual confusion was convincing that there was no likelihood of confusion). The PROTRACKER SOFTWARE, INC. and PRO TRAK INTERNATIONAL, INC. names, the PROTRACKER.COM and PROTRAK.COM domain names and the PROTRACKER and PROTRAK marks have coexisted for nine (9) years with no instances of confusion, and one insignificant clerical error. SMF 6, 52, 57. Additionally, the product names PROTRACKER ADVANTAGE and PROTRAK ADVANTAGE have coexisted for one and a half years with no actual confusion. SMF 9, 52, 57.

Even if the court determines Mr. Andera's clerical error was in fact actual confusion, this is only one instance of actual confusion in the nine (9) years of coexistence of the parties' names and marks. One isolated instance of confusion does not constitute probable confusion. *Int'l Assn of Machinists*, 103 F.3d 196 at 201. This one alleged instance, especially considering the details, is a negligible amount of confusion and does not demonstrate actual confusion.

The lack of evidence supporting actual confusion weighs heavily in favor of Defendant as the names and marks have coexisted for a significant period of time without actual confusion occurring. Not only does this not show likelihood of confusion, but it also weighs quite heavily against an overall finding of likelihood of confusion.

4.      **Intent In Adopting The Mark**

Defendant did not exhibit any bad faith when adopting the names and marks PROTRACKER SOFTWARE, INC., PROTRACKER, PROTRACKER SYSTEM, PROTRACKER.COM, or PROTRACKER ADVANTAGE. At the time he incorporated Defendant, Warren Mackensen conducted a search to make sure his chosen company and product names were not in conflict with any other names. SMF 6. Mr. Mackensen learned of another New Hampshire company called Pro-Track, Inc., and obtained its consent to incorporate his company as "ProTracker Software, Inc." Mr. Mackensen selected the names and marks PROTRACKER, PROTRACKER.COM, PROTRACKER SOFTWARE, INC. and PROTRACKER SYSTEM well before Defendant ever learned of Plaintiff. Additionally, when Defendant changed the component term "system" to "advantage" in its product name, he was not aware that Plaintiff purportedly was also using the component term "advantage". SMF 18.

Defendant first learned of the existence of Plaintiff, its name and its products during prosecution of Defendant's PROTRACKER SYSTEM application (well after Defendant's incorporation under the name ProTracker Software, Inc.). SMF 7. Defendant investigated Plaintiff as best it could. SMF 7. During the prosecution of Defendant's trademark application, Defendant determined that there was no likelihood of confusion, for all the reasons discussed above, namely different products, different customers, different marketing, different channels of trade, no actual confusion, expensive products and different price points, etc. SMF 7. When Defendant adopted the PROTRACKER ADVANTAGE mark, again, it did so after careful consideration and investigation and because it believed that the term "advantage" was a good descriptive term to describe the "advantages" the product provided to the product's user over the

19

user's competitor who was not using the product. SMF18-19. Also, the term describes the "advantages" of the software over previous versions. SMF 18.

Plaintiff has never applied for a U.S. trademark registration for the mark "Pro Trak Advantage," thus, a search of the Trademark Office records did not reveal Plaintiff's mark. SMF 27. The search Defendant conducted for the mark "PROTRACKER ADVANTAGE" showed that the mark was available for use. SMF 19. At the time Defendant changed its product name from to PROTRACKER ADVANTAGE, Defendant was not aware of Plaintiff's purported prior use. SMF 19. Indeed, from a review of Plaintiff's web site, it is difficult to tell even today that it has a product that includes the component term "advantage".

Thus, Defendant had no bad intent in adopting any of its marks. The good faith, and more specifically the lack of bad faith on the part of Defendant in adopting its PROTRACKER, PROTRACKER.COM, and PROTRACKER ADVANTAGE marks weighs in favor of Defendant and that there is no likelihood of confusion.

## 5.   <u>Strength Of Mark</u>

PROTRAK, PROTRACKER, PROTRAK ADVANTAGE, and PROTRACKER ADVANTAGE are not very strong marks. A search on the United States Trademark Office web site shows over 100 registrations and applications for marks that include the common portion of PROTRAK and PROTRACKER as part of a component term, "protra." SMF 45. A search for marks that include the component term "advantage" shows over 2,700 registrations and applications, with over 700 in International Class 009. SMF 46. The term has no significance outside of being descriptive and laudatory, in which no party has enforceable rights. As shown by the sheer number of parties using the components of the marks, the marks are not very strong.

6.      **The Marks Are Different**

Plaintiff alleges infringement based on Defendant's use of its names and marks

PROTRACKER, PROTRACKER.COM, and PROTRACKER ADVANTAGE[4]. Plaintiff asserts

that these marks are confusingly similar to marks it claims rights in, PROTRAK and PROTRAK

ADVANTAGE. The parties' respective marks are spelled and pronounced differently:

PROTRACKER has three syllables, PROTRAK has only two syllables. PROTRACKER is

spelled with a "CK," while PROTRAK is spelled with only a "K". This is especially important

because of consumer's use of Internet search engines, where correct spelling is very important in

finding information. The different spellings of the parties' names and marks make it less likely

that consumers will be confused.

Defendant also uses the mark PROTRACKER ADVANTAGE in connection with its

product. The component "advantage" is a descriptive, laudatory term that describes the

advantage that a user of Defendant's product would have over a competitor that does not use

Defendant's product. SMF 18. Plaintiff also includes the component "advantage" in connection

with its mark, but again, it is a descriptive term that does not add additional significance or

weight to Plaintiff's PROTRAK mark.

Even comparing the marks with both component terms, PROTRACKER ADVANTAGE

still has one additional syllable than and a different spelling from PROTRAK ADVANTAGE.

Additionally, in determining the total commercial impression or connotation of the mark,

it is also necessary to review how the mark is used in general, for example on the goods and

packaging and in advertising. *See generally Pignons S.A. De Mecanique De Precision v.*

*Polaroid Corp.*, 657 F.2d 482, 487 (1st Cir. 1981) (the use of the mark ALPHA in close

---

[4] Plaintiff does not explicitly assert infringement by Defendant's use of its trade name PROTRACKER
SOFTWARE, INC. or its mark PROTRACKER SYSTEM, although those presumably are covered in Plaintiff's
assertions against Defendant's use of the PROTRACKER mark.

proximity with the logo and company name was found to reduce the similarity of the mark to the mark ALPA). The actual visual impact of the parties' names and marks are significantly different, especially as used by the parties with their corresponding logos. Defendant's logo is in all lower case letters with the "pro" portion in yellow and the "tracker" portion in blue. Defendant's logo also includes a box situated over the "otr" of "protracker" with the letters "pt" in the upper right hand corner of the box. The word "software" is located in capital letters but a smaller font beneath the "tracker" of "protracker."



On the other hand, Plaintiff's logo uses all capital letters and is mostly black. The "O" of "Pro Trak" is in a larger font than the rest of "Pro Trak" and is disjointed, such that there appear to be two separate halves to the "O." The word "international" follows "Pro Trak," is also in all capital letters, but is in a significantly smaller font than "Pro Trak." Additionally, the logo is almost entirely in black, with only the left half of the "O" in orange.

When looking at the overall commercial impression of the marks, especially the different connotations they provide during their use, the significant differences in the visual impact between the parties' respective marks indicates that the marks are quite different from one another, and that potential consumers are not likely to confuse the parties or their goods.

**D.    Pro Trak's Asserted U.S. Reg. No. 1,835,278 Should Be Cancelled**

Plaintiff has asserted U.S. Trademark Reg. No. 1,835,278 for the mark PROTRAK against Defendant. *See* Complaint, Counts One and Two. The asserted registration is invalid, however, and should be ordered cancelled by the Court. The registration is invalid because when

it was assigned to Plaintiff, the assignor had no goodwill to assign with the mark. Section 10 of the Lanham Act provides that a valid trademark assignment must carry with it the assignment of goodwill which the trademark symbolizes. *15 U.S.C. §1060*. It is well established that a trademark has no independent significance apart from the goodwill it symbolizes, and cannot be sold or assigned apart from the goodwill it symbolizes. *Marshak v. Green*, 746 F.2d 927, 929 (2nd Cir. 1984); *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90 (1928); *American Steel Foundries v. Robertson*, 269 U.S. 372 (1926). An assignment of a trademark without goodwill is an assignment in-gross and "does not transfer any legal rights to the assignee." *Greenlon, Inc. of Cincinnati v. Greenlawn, Inc.*, 542 F. Supp. 890, 893 (S.D. Ohio 1982); *citing Bourjois & Co. v. Katzel*, 260 U.S. 689 (1923). A trademark assignment in-gross is invalid since the assignor relinquished nothing, and no rights transferred to the assignee. *Greenlon,* 542 F.Supp at 895.

The goodwill can take the form of physical assets or intangible knowledge and ways of conducting business. *Greenlon,* 542 F.Supp at 894. A trademark and its associated goodwill are inseparable, and one does not survive without the other. 2 J. McCarthy, on Trademarks § 18:2 (4th ed. 1996). If the trademark assignor has stopped using the mark and abandoned the mark prior to the assignment, then there is no goodwill to assign. *See Supra*.

Plaintiff did not file the application that resulted in the asserted registration. SMF 47-48. Plaintiff obtained the registration from its then-owner, Marmen, well after Marmen had abandoned the mark. SMF 48. Because Marmen had abandoned the mark when it assigned its "rights" in the mark to Plaintiff, the assignment is void, the registration invalid, and it should be cancelled. Marmen stopped using and had no intention of resuming use of the mark PROTRAK well before July 1998. SMF 50. Before Marmen assigned the PROTRAK mark, it had abandoned the mark and had no goodwill associated with the mark. SMF. Marmen did not

transfer any technical information, know-how, software, business information, business, customers, customer lists, or physical or intangible assets to Pro Trak. SMF 51. Therefore, the assignment of PROTRAK did not include the transfer of any goodwill.

In July 1998, Ralph Wood, attorney for Plaintiff, called Marmen regarding its PROTRAK trademark registration. SMF 47. Attorney Wood spoke with Steven Le Boeuf, Vice President of Marmen. SMF 47. That same day, attorney Wood memorialized his conversation in a letter to Mr. Le Boeuf. SMF 47. Attorney Wood said in his letter, "However, if as you indicated, Marmen is no longer using the mark [PROTRAK], we might be able to avoid the cancellation proceeding by having Marmen assign the mark to Pro Trak." SMF 47. Thus, Plaintiff knew that Marmen had stopped using the mark PROTRAK and that there was no goodwill to be assigned. Nonetheless, Plaintiff agreed to pay $750 for the assignment. SMF 48. Attorney Wood drafted the assignment, which Mr. Le Boeuf signed on behalf of Marmen. SMF 48. Mr. Le Boeuf recently confirmed that he told Attorney Wood that Marmen had abandoned the mark prior to the assignment. SMF 50. He also confirmed that Marmen assigned no goodwill to Plaintiff. SMF 50.

Because the assignment by Marmen was invalid, the mark and registration were never transferred and thus still belongs to Marmen. However, since Marmen abandoned the mark long ago, the registration is invalid and should be cancelled. Because asserted U.S. Trademark Reg. 1,835,278 is invalid, it should be cancelled, and summary judgment entered in favor of Defendant on Counts One and Two in the Amended Complaint and Count II of Counter-Plaintiff's Counterclaim.

## II.  <u>CONCLUSION</u>

In view of the foregoing, Defendant has demonstrated that Pro Trak is barred from obtaining any relief in this action under the doctrine of laches. Defendant has demonstrated that there is no likelihood of confusion between Defendant's and Plaintiff's names and marks. For the foregoing reasons, pursuant to Rule 56 Fed. R. Civ. P., Defendant is entitled to summary judgment on all counts of Plaintiff's Amended Complaint, Count I of Counter-Plaintiff's Counterclaim and Defendant's Affirmative Defenses 1-4 and 6. In addition, the asserted registration is invalid and should be cancelled. Defendant is entitled to summary judgment on Count One and Two of Plaintiff's Amended Complaint, Count II of Counter-Plaintiff's Counterclaim, Defendant's Affirmative Defense 7 and the Court should order the Commissioner of Trademarks to cancel U.S. Trademark Reg. No. 1,875,278, pursuant to 15 U.S.C. § 1119.


|  | PROTRACKER SOFTWARE, INC. |
|---|---|
| Dated: August 15, 2006 | |
| | By: /s/Mark K. Suri |
| | One of Its Attorneys |

| Teresa C. Tucker | Mark K. Suri |
|---|---|
| GROSSMAN, TUCKER, | Eric H. Weimers |
| PERREAULT & PFLEGER, PLLC | RYNDAK & SURI LLP |
| 55 South Commercial Street | 200 West Madison Street, Suite 2100 |
| Manchester, NH 03101 | Chicago, IL 60606 |
| Telephone:  603-668-6560 | Telephone:  312-214-7770 |
| Facsimile:  603-668-2970 | Facsimile:  312-214-7715 |
| Email:  ttucker@gtpp.com | Email: suri@ryndaksuri.com |

## <u>CERTIFICATE OF SERVICE</u>

I, Mark K. Suri, certify that a true and correct copy of the foregoing **MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** was served electronically, through ECF, upon counsel for Plaintiff Pro Trak International, Inc.:

> Michael J. Bujold, Esq.
> Davis & Bujold P.L.L.C.
> 112 Pleasant Street
> Concord, NH 03301-2931
> Telephone: (603) 226-7490
> Facsimile:  (603) 226-7499
> Email:  patent@davisandbujold.com

on this 15th day of August, 2006.

> By:  /s/Mark K. Suri
> Mark K. Suri
> Attorney for Defendant