UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

PRO TRAK INTERNATIONAL, INC.,　　　　　　　 )
　　　　　　　　Plaintiff,　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　　　　　　　　)　　Civil Action
　　　　　　　　　　　　　　　　　　　　　　　　　)　　No.C-05-342-JM
PROTRACKER SOFTWARE, INC.,　　　　　　　　　)
　　　　　　　　Defendant.　　　　　　　　　　　 )

**PLAINTIFF PRO TRAK INTERNATIONAL, INC. OPPOSITION TO DEFENDANT
PROTRACKER SOFTWARE, INC.'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Pro Trak International, Inc. ("ProTrak") opposes the Summary Judgment motion filed by Defendant Protracker Software, Inc. ("Protracker") because there are genuine issues of material fact in dispute.  Among ProTrak's facts which dispute Protracker's facts: after having had its application to register PROTRACKER SYSTEM refused under 15 U.S.C. §1052(d) by the Patent and Trademark Office ("PTO") on the ground of being likely to cause confusion with ProTrak's registered mark PROTRAK, Exhibits A; Exhibit B, Protracker expressly abandoned the application, Exhibit N, and filed an application to register a new mark, PROTRACKER ADVANTAGE, in the PTO, Exhibit E, a mark conspicuously similar to ProTrak's mark PROTRAK ADVANTAGE.  Prior to the abandonment and in support of the PROTRACKER SYSTEM application, Protracker submitted, *inter alia*, to the PTO (a) an affidavit from its president in which he averred that he was aware of ProTrak and its products, Exhibit C, and (b) certain pages from ProTrak's website (with ProTrak's domain name and telephone number thereon).  Exhibit D (PSI0451 - PSI0473).

On about **December 22 or 23, 2004**, Protracker actually commenced using PROTRACKER ADVANTAGE on a commercial level.  Mackensen Depo. at 159 - 160.  On **May 25, 200**5, Protracker's president demonstrated his company's product at a conference in Chicago, **an event which led to actual confusion occurring**.  *Id*. at 165; Exhibits F and G.

ProTrak's facts will show, *inter alia*, that Protracker's new mark PROTRACKER ADVANTAGE is extremely similar at least to ProTrak's marks PROTRAK and PROTRAK ADVANTAGE and that the two companies' goods are related and are promoted and sold to the same class of consumers.   Notwithstanding being a very small company, Mackensen Depo. [CONFIDENTIAL], Exhibit I [CONFIDENTIAL], Protracker Exhibit A at (Mackensen Affidavit at ¶9), Protracker's activities have already generated ***actual*** confusion that might have been avoided had Protracker, which was aware of Protrak and its products (Exhibits C and D), more carefully investigated or contacted ProTrak after its application on PROTRACKER SYSTEM was refused.   "[T]here is an affirmative duty to avoid any likelihood of confusion." *Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814 F.2d 812, 817 (1st Cir. 1987).

## I.   STATEMENT OF MATERIAL FACTS

1.  ProTrak commenced use of PROTRAK and PROTRAK INTERNERNATIONAL in 1988 and PROTRAK ADVANTAGE in 2001 for client relationship management ("CRM") software, which is a type of database management system that, among other things, manages directories, and provides customer support services for that software.   ProTrak continues to use the marks. Koziel Aff'd at ¶¶'s 2 - 3.

2.  ProTrak owns, by virtue of an assignment, Registration No. 1,835,278 on PROTRAK for "database management system; namely, computer software used to manage directories." Exhibit A; Koziel Aff'd at¶ 7 - 8.  The registration is incontestable.  Exhibit A (*see,* Section 15 designation at 1).

3.  ProTrak's products and services are promoted to and used by companies in the investment management industry.  Koziel Aff'd at ¶¶'s 4, 14 and 19.  The investment management industry includes, *inter alia*, professional management of and advisory services with respect to various

securities (e.g. shares and bonds) and other assets (e.g. IRA's and real estate) for purposes of meeting specified investment goals for the benefit of investor clients.  Such clients include institutions (insurance companies, pension funds, corporations etc.) and retail investors (e.g. individuals and families).  Companies in the investment management industry may and do manage assets for either or both institutional and retail investors. Koziel Aff'd at ¶¶'s 5 - 6.  *See e.g.*, Exhibit J [CONFIDENTIAL]; Exhibit K.

4.  Protracker filed an application to register PROTRACKER SYSTEM.  Exhibit L.  The application was refused under 15 U.S.C. 1052(d) (likelihood of confusion) due to Registration No. 1,835,278 on PROTRAK.  Exhibits M and B.  On appeal from the refusal, Protracker submitted, on or about July 12, 2002, an affidavit, dated November 26, 2001, from its president which indicates that he is aware of ProTrak and its products, and submitted pages from ProTrak's website.  Exhibits C and D.

5. On or about October 29, 2002, Protracker expressly withdrew its application.  Exhibit N.

6.  On or about September, 2003, Protracker filed an application to register PROTRACKER ADVANTAGE.  Exhibit E.  On or about December 22 or 23, 2004, Protracker commenced using PROTRACKER ADVANTAGE on a commercial level.  Mackensen Depo. At 159 - 160; *cf.* Mackensen Depo at 144-145.

7. On or about May 25, 2005, Protracker presented its PROTRACKER ADVANTAGE software at a TD Waterhouse conference panel for large and small businesses.  Exhibit O; Mackensen Depo. at 165.

8.  Dave Andera, in Marketing, at Capital Investment Services of America, attended that conference. Mackensen Depo 94 – 97; Koziel Depo at 161 – 162; Exhibit P; Protracker Exhibits M and N.

9.  From information received at that conference, Mr. Andera was confused when he spoke with ProTrak.  Exhibit F.  Later, Mr. Andera contacted Protracker.  Exhibit G.  He did not purchase any products.  Mackensen Depo. at 95.

10. Protracker is a very small company, which operated for its first three years out of its president's home.   Protracker Exhibit A (Mackensen Affi'd at ¶9).   Mackensen Depo [CONFIDENTIAL]; Exhibit I [CONFIDENTIAL].

11.  ProTrak obtained a Dunn & Bradstreet report about Marmen Computing Company ("Marmen") on or about June 23, 1998.  Wood Depo at 26 – 27; Exhibit Q (Exhibit 6 to Wood Depo.).  ProTrak also ordered a trademark search on PROTRAK on or about June 23, 1998.  Exhibit R.   "In fact, Plaintiff used this search report to gather information about, Marmen Computing, Inc. (Marmen) who owned a trademark registration for the mark PROTRAK."  Corrected Memorandum in Support of Defendant's Motion for Summary Judgment ("Protracker's Memo") at 6.

12.  References to Marmen's PROTRAK mark appear on pages K0Z001040 (US Registration) and K0Z001295 (Common Law Use) of the search report in Exhibit R.  There are no evident common law references to Protracker in the search report.

13.   As of April 28, 1998, Marmen was using PROTRAK for enterprise-wide computer networks in municipal, corporate and governmental environments, Exhibit S, and to manage databases (e.g. "The largest **involves** over 6 millions records on the Michigan state registered voter list **currently being managed** for the Michigan Republican party."  *Id*. at PSI0752 (Emphasis added).

14.  A dispute ensued with Marmen regarding PROTRAK and, in settlement thereof, Marmen assigned its rights therein to ProTrak.  Wood Depo at 11 – 13.  Protracker Exhibits G, L and K

(LeBeuf Affidavit at ¶¶'s 7 – 9).  $750 was paid by ProTrak to Marmen.  Koziel Aff'd at 8.

15.  ProTrak's sales in connection with its marks are sufficiently large for confusion to occur. Koziel Aff'd at ¶ 20.

Other facts are included in the argument.

## II.   LEGAL STANDARDS

While not invariably so, "'infringement and unfair competition cases often present factual issues that render summary judgment inappropriate.'"  *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 24 (1 Cir. 1989)  The party moving for summary judgment must first show the absence of a genuine issue of material fact in the record. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "On summary judgment, all reasonable inferences must be drawn in favor of ... the non-moving party."  *Beacon Mut. Ins. Co. v. OneBeacon Ins. Group*, 376 F.3d 8, 10 (1st Cir. 2004)

## III.   LEGAL STANDARDS FOR TRADEMARK INFRINGEMENT

The public and trademark owners are protected under the Lanham (Trademark) Act, 15 U.S.C. 1151 *et seq.*, by "prevent[ing] the use of the same or similar marks in a way that confuses the public about the actual source of the goods or service."  *Star Fin. Servs., Inc. v. Aastar Mortgage Corp.*, 89 F.3d 5, 9 (1st Cir. 1996); *see also I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 36 (1st Cir. 1998); *Int'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr.*, 103 F.3d 196, 200 (1st Cir. 1996).  15 U.S.C. §1114(1) defines trademark infringement as "use. . . of any reproduction, counterfeit, copy, or colorable imitation of a registered mark . . . likely to cause confusion."  Similarly, 15 U.S.C. §1125(a)(1) define unfair competition as use of "any word, term, name, symbol, or device . . . likely to cause confusion."[1]

---

1  As noted in Protracker's Corrected Memorandum in Support of Defendant's Motion for Summary Judgment (Protracker's Memorandum) at 9, the state law claims also turn on

Whether or not there is a likelihood of confusion is a question of fact. *Anheuser-Busch v. Caught-on-Blue*, 288 F. Supp. 2d 105, 114 (DNH 2003), *aff'd without op.*, 105 Fed. Appx. 285 (1st Cir. 2004), *cert. den.*, 544 U.S. 920, 125 S. Ct. 1639, 161 L. Ed. 2D 477 (2006). Such is determined by examining eight factors, which are:

> (1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its mark; and (8) the strength of the plaintiff's mark.

*Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814 F.2d 812, 817 (1st Cir. 1987). The factors must be assessed "on the whole" and, in connection therewith, each factor must be considered. *Id*. The factors "must be evaluated in context, [and] any meaningful inquiry into the likelihood of confusion necessarily must replicate the circumstances in which the ordinary consumer actually confronts (or probably will confront) the conflicting mark." *Int'l Ass'n of Machinists*, 103 F.3d at 201.[2] Further, "likelihood of confusion inquiry is not limited to actual or potential purchasers, but also includes others whose confusion threatens the trademark owner's commercial interest in its mark." *Beacon Mut. Ins. Co.*, 376 F.3d at 16.

**IV. PROTRACKER HAS INFRINGED PROTRAK'S TRADEMENT RIGHTS**

    **1. <u>THE MARKS</u>.** While Protracker asserts that the marks themselves are dissimilar,

---

likelihood of confusion.

2 While not raised by Protracker in its motion, it is noted that in order to prevail at trial, ProTrak would also need to show (1) that it uses, and thereby 'owns,' a mark, (2) that Protracker is using that same or a similar mark, and (3) that the Protracker's use is likely to confuse the public. *DeCosta v. Viacom Int'l, Inc.*, 981 F.2d 602, 605 (1 Cir. 1992); *see also Int'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr.*, 103 F.3d 196, 200 n.5 (1 Cir. 1996). Protracker has sought to cancel ProTrak's registration but does not deny that ProTrak used PROTRAK, PROTRAK INTERNATIONAL or PROTRAK ADVANTAGE prior to the time that Protracker commenced use of any of its marks or that ProTrak owns either PROTRAK, PROTRAK INTERNATIONAL or PROTRAK ADVANTAGE. Protracker, then, essentially raises only whether or not under the Lanham Act or state law, the marks are likely to cause confusion.

ProTrak's facts show that the marks are extremely similar.  In fact, the Patent and Trademark Office refused Protracker's application to register PROTRACKER SYSTEM under 15 U.S.C. § 1052(d) (likelihood of confusion) based on ProTrak's registration on PROTRAK.  Exhibits M and B.  Not only was Protracker's application refused but, on appeal, the Examining Attorney explained that the marks are "**highly similar in sound, appearance, connotation and commercial impression**."  Exhibit T at PSI0566 (p5).  *See*, *Volkswagenwerk*, 814 F.2d at 817 (similarity may concern sound, appearance or meaning).

The determinations of the Patent and Trademark Office should be afforded great weight. *Syntex Laboratories, Inc. v. Norwich Pharmacal Co.*, 437 F.2d 566, 569 (2d Cir. 1971) (determination of Patent Office in trademark matter entitled to great weight); *Carling Brewing Co. v. Philip Morris, Inc.*, 297 F.Supp. 1330, 1337 (N.D. Ga. 1968); *Antique Import Corp. v. Royal Saxe Corp.*, 311 F.Supp. 1261, 1274 (S.D.N.Y. 1970); *see also Murphy Door Bed Co., Inc. v. Interior Sleep Systems, Inc.*, 874 F.2d 95, 101 (2d Cir. 1989).

In fact, **<u>Protracker</u>** opposed a third party application to register PRO TRAK, claiming that Protracker's then mark PROTRACKER SYSTEM is similar to PRO TRAK, Exhibit AA at PSI0744 (¶¶'s 7 and, especially, 9).  Whatever the actual circumstances were, Protracker's allegations were unequivocal.

"It has been held that when one adopts a mark similar to one already in use, there is an affirmative duty to avoid any likelihood of confusion."  *Volkswagenwerk Aktiengesellschaft*, 814 F.2d at, 817.  It is submitted that Protracker, which averred that it was aware of ProTrak and its products with respect to its application on PROTRACKER SYSTEM, Exhibit C, has not met its affirmative duty to avoid any likelihood of confusion.  If anything, Protracker has aggravated the situation, by commencing use of the mark PROTRACKER ADVANTAGE, a mark

remarkably similar to PROTRAK ADVANTAGE, on or about December 22 or 23, 2004. Mackensen Depo. At 159 – 160.

Protracker claims that the mark element "Advantage" is merely descriptive or laudatory, which is a category of descriptiveness.  Trademark Manual of Examining Procedure (TMEP), (4th Ed., rev. April 2005), §1209.03(k) ("Laudatory terms, those that attribute quality or excellence to goods or services, are merely descriptive under §2(e)(1) [15 U.S.C. § 1052(e)(1)].").   The argument appears to be that PROTRACKER ADVANTAGE and PROTRAK are thus distinguishable (although PROTRACKER ADVANTAGE is obviously not thereby distinguishable from PROTRAK ADVANTAGE because "Advantage" appears in both marks).

If, *arguendo*, "Advantage" is descriptive or laudatory,[3] then "Advantage" is no different from the descriptive term "System," and thus does nothing to distinguish Protracker's mark from PROTRAK.  As explained by the Examining Attorney, with respect to PROTRAK SYSTEM:

> The applicant [Protracker] has merely added a descriptive term to the dominant portion of the mark.  While the examining attorney must look at the marks in their entireties under Section 2(d) [15 U.S.C. § 1052(d) (likelihood of confusion)], nevertheless, one feature of a mark may be recognized as more significant in creating commercial impression.  Greater weight is given to that dominant feature in determining whether there is a likelihood of confusion.

Exhibit T at PSI0566 – PSI0567.[4]

Protracker also claims that the marks are distinguishable by their designs.   *See*, Protracker's Memorandum at 22.  First, the marks are presented a number of different ways, s*ee*

---

3  Protracker, in fact, informed the PTO that "Advantage" is suggestive, not merely descriptive. *Infra* at 15.

4  The same can be said about the word "International."  See T.M.E.P. §1209.03(o) ("The terms "NATIONAL" and "INTERNATIONAL" have been held to be merely descriptive of services that are nationwide or international in scope.")

*e.g.*, Exhibits H, U and V, such that the comparison is misleading.  In fact, the home pages of Protracker's website also prominently shows PROTRACKER (e.g. Exhibit BB, left hand column under the "Products" heading) numerous times in bold-type letters, above, for example, the mark element "Advantage."

In addition, the design distinctions drawn are *de miminus* and, it is submitted, not of the type made by consumers, who do "not retain all the details of a mark, but rather the mental impression the mark creates in its totality." *T & T Mfg. Co. v. A.T. Cross Co.*, 449 F.Supp. 813, 820 (D.RI 1974), *aff'd.*, 587 F.2d 533 (1 Cir. 1978), *cert. den.*, 441 U.S. 908, 60 L.Ed.2d 377, 99 S.Ct. 2000 (1979).

**2.  <u>GOODS</u>**.  "The Lanham Act 'gives the trademark owner protection against use of its mark on any product or service which would reasonably be thought by the buying public to have come from the same source.'"  *Anheuser-Busch*, 288 F.Supp.2d at 118 (*Quoting* Thomas McCarthy, *4 McCarthy on Trademarks and Unfair Competition*, (4th Ed. 2002) §24:6).  While Protracker claims that the goods are dissimilar, ProTrak's facts show that the goods are similar– which is also the opinion of the Patent and Trademark Office:

> In fact, the applicant [Protracker] states its program "manages client data, such as telephone conversations, employee action item lists, client assets, names of other professionals that the client uses...names of relatives for wealth transfer planning...and so forth."  And in addition tracks names, prints address/telephone lists.  All of which can be part of a directory such as the registrant's program manages.

Exhibit B.  Again, the determinations of the Patent and Trademark Office should be afforded great weight. *See*, *Syntex Laboratories, Inc.*, 437 F.2d at 569; *Carling Brewing Co.*, 297 F.Supp. at 1337; *Antique Import Corp.*, 311 F.Supp. at 1274.  In fact, quite a bit of this functionality is part of both Protracker and ProTrak's software, as promoted by the companies.  *Compare* Exhibit U and V; Mackensen Depo at 34 – 65.  Koziel Aff'd at ¶ 18.  Such similarities show that

- 9 -

the goods are similar.

**3, 4 & 5.  PROSPECTIVE CONSUMERS, PROMOTIONAL ACTIVITIES AND TRADE CHANNELS**.  Protracker's facts purport to show that the class of prospective customers is different, that the trade channels differ and that the promotional activities differ. ProTrak's facts show, instead, that the class of prospective customers significantly overlaps, that the channels of trade are related and that there is an overlap in promotional activities.

In fact, prospective purchasers of both parties goods provide services to both retail clients (e.g., individuals and families) and institutional client (e.g., company pension funds). For example, Protracker's customers, Mackensen Deposition at 21 – 22 [CONFIDENTIAL] and 32 – 33. [CONFIDENTIAL], promote their services as being for both institutional and retail clients.  Exhibit J [CONFIDENTIAL].  In fact, a company which was actually confused, *see*, *infra* at 11 - 13, Capital Investment Services of America, promotes its services as being for both the retail (individual) and institutional clients (employee benefit plans).  Exhibit K.

In fact, customers come to both ProTrak and Protracker looking to step up from more elementary client relationship management solutions such as Microsoft Outlook and Goldmine. *See*, Mackensen Depo at 27 and Koziel aff'd ¶9.  Both ProTrak and Protracker have lost clients to Salesforce.com.  Mackensen Depo at 29 – 30; Koziel Aff'd. at ¶10.[5]

Both Protracker and ProTrak software can be downloaded from the respective party's

---

5 Protracker argues that the goods are expensive such that consumers will not be confused.  The fact that the goods are expensive or the purchasers sophisticated does not mean that confusion is unlikely to occur.  "Human memories, even of discriminating purchasers, technicians, etc., are not infallible."  *Carlisle Chem. Works, Inc. v. Hardman & Holden, Ltd.*, 434 F.2d 1403, 1406 (CCPA 1970).  In fact, as the Examining Attorney stated in response to the Protracker's sophisticated purchaser argument on appeal in the PROTRACKER SYSTEM application, "The fact that purchasers are sophisticated or knowledgeable in a particular field does not necessarily mean that they are sophisticated or knowledgeable in the field of trademark or immune from source confusion."  Exhibit T at PSI0574.  This is especially the case in the case at bar as the marks are extremely similar.

website.  Mackensen Depo at 27 (link emailed).  Koziel Aff'd at 16 (key assigned).  A party visiting either website would see software solutions for use in client relationship management. Exhibits U and V.

Both companies promote their products in similar ways.   Both companies operate websites.  Mackensen Depo at 25; Koziel aff'd at ¶11.  Of particular importance to this dispute, both Protracker and ProTrak make presentations at conferences.   Mackensen Depo at 165; Koziel Aff'd at 12.  For example (and further discussed under the actual confusion heading below), Protracker's President presented its product "as part of a panel **on client relationship management solutions for small and large businesses**."   Mackensen Depo at 165 – 168. (Emphasis added).

**6. ACTUAL CONFUSION**.  In the First Circuit, "actual confusion is commercially relevant if the alleged infringer's use of the mark 'could inflict commercial injury in the form of . . . a diversion of sales, damage to goodwill, or loss of control over reputation' on the trademark holder." *Beacon Mutual Ins. Co. v. OneBeacon Ins. Group*, 376 F.3d 8, 15 (1st Cir. 2004).

In reply to Protracker's assertion that confusion has not actually occurred or is insignificant, ProTrak's facts show that confusion did occur and is very significant.  The gist of the event is that Dave Andera, of marketing, at Capital Investment Services of America, a company which promotes its services as being for both retail (individual) and institutional clients (e.g. employee benefit Plans), Exhibit K, attended the above mentioned panel on client relationship management solutions for small and large businesses.  Mackensen Depo 94 – 97; Koziel Depo at 161 – 162; Exhibit F and G (i.e. Protracker M and N).  He evidently liked Protracker's graphical user interface, Mackensen Depo at 97, but rather than contacting Protracker about what he had seen, he first had discussion with ProTrak, stating that he had

- 11 -

learned about ProTrak at the above noted conference.  *Supra* at 11; Exhibit F.  ProTrak's sales agent called back and confirmed that Mr. Andera was interested in CRM software and informed him that ProTrak had not been at the noted conference.  *Id*.  In a subsequent conversation, Mr. Andera indicated that he had confused ProTrak and Protracker but remained interested in learning about ProTrak's product.  *Id*.  Later, he contacted Protracker but determined that its product was not suitable.  Exhibit G; Mackensen Depo at 93 – 97.

The timing of this known incident of actual consumer confusion is significant.  On or about December 22 or 23, 2004, Protracker released its new version of its software, with its new user interface.  Mackensen Depo at 28 – 29.  This new version is called PROTRACKER ADVANTAGE, which is a conspicuously similar to ProTrak's then and now existing program called PROTRAK ADVANTAGE.  The conference which may have precipitated the incident occurred not long thereafter, on or about May 25, 2005.  Mackensen Depo at 165.

Even assuming, arguendo, that Protracker has used the relevant mark for a substantial amount of time, the fact is that Protracker's use, during much of that period, has been minimal so that there have not been that many opportunities for actual confusion to occur – yet confusion has actually occurred.  During its first three years of operation, Protracker did business out of its president's home. Summary Judgement Exhibit A (Mackensen Aff'd. At ¶9).  *See* Exhibit I [CONFIDENTIAL] as to Protracker's sales, during the first three years and thereafter. Mackensen Depo. [CONFIDENTIAL]; Exhibit I [CONFIDENTIAL].

It is submitted that a party who, after seeing a demonstration of Protracker's product, confuses ProTrak with Protracker does, in fact, damage ProTrak's good will and, moreover, places ProTrak's reputation outside of its control.  This incident, which occurred shortly after Protracker, a small company, changed marks, is highly indicative of the confusion which is

likely to continue.

**7.   DEFENDANT'S INTENTIONS**.   Contrary to Protraker's facts showing good intention, ProTrak's facts show otherwise.   Protracker's application on PROTRACKER SYSTEM was refused on the basis of ProTrak's registration on PROTRAK.   Exhibit B. Protracker, in an effort to overcome the refusal, submitted evidence to the Patent and Trademark Office about ProTrak,  Exhibit D, and submitted an affidavit which averred that Protracker's president is aware of ProTrak and its products.   Exhibit C.   Protracker's application on PROTRAK SYSTEM was subsequently withdrawn expressly by Protracker.   Exhibit N. Thereafter, Protracker changed its mark to PROTRACKER ADVANTAGE.  Mackensen Depo at 144-145.

Protacker asserts that it did not discover ProTrak's use of PROTRAK ADVANTAGE during its search.  Again, "there is an affirmative duty to avoid any likelihood of confusion." *Volkswagenwerk Aktiengesellschaft*, 814 F.2d at, 817.  It is submitted that Protracker, whether or not it conducted a search, having had its application on PROTRACKER SYSTEM refused due to ProTrak's registration on PROTRAK, Exhibit B, and already being aware of ProTrak and its products, Exhibit C, could readily have discovered that ProTrak was already using PROTRAK ADVANTAGE.  Koziel Aff'd. at 17.  Protracker knew exactly where to look, as it had previously submitted pages from ProTrak's website to the Patent and Trademark Office. Exhibit D.

**8.   THE STRENGTH OF THE PLAINTIFF'S MARK**.   Protracker's evidence purports to show that the mark is weak.  Contrary to that evidence, ProTrak's evidence shows that the mark is strong enough for confusion to be likely to occur.

Examining, first, Protracker's evidence, which consists of materials purportedly from the

Patent and Trademark Office, is not, as a matter of law, evidence about the strength of the mark. As stated by Professor McCarthy in volume two of his famous treatise, "it is well settled that a trademark search report does not constitute evidence of either the existence of a registration or of the use of a mark."  2 *McCarthy on Trademarks and Unfair Competition*, 4th ed. (2006), § 11:88 at 11-171.  Even if Protracker's evidence had consisted of actual third party registrations, "the courts will not assume that third party registrations are in such extensive use that they are probative of weakness."  *Id.* § 11:89 at 11-173.  Search report evidence amounts to hearsay.  *Id.*

Moreover, even assuming that the search results were evidence of the use of the mark, the evidence does not show the pertinent goods or services.  As the First Circuit has written, "renown in the plaintiff's field of business" is what matters in assessing the strength of a mark. *Beacon Mut. Ins. Co.*, 376 F.3d at 19 (*quoting*, *Star Fin. Servs. v. Aastar Mortg. Corp.*, 89 F.3d 5, 11 (1st Cir. 1996)).[6]

Rather than examine unrelated information, the First Circuit "look[s] to 'the length of time the mark has been used, its renown in the plaintiff's field of business, and the plaintiff's actions to promote the mark.'"  *Beacon Mut. Ins. Co.*, 376 F.3d at 19.   However, evidence regarding both Plaintiff and Defendant's renown would be considered relevant.  *Attrezzi, LLC v. Maytag Corp.*, 436 F.3d 32, 40 (1st Cir. 2006).

ProTrak's evidence shows that its mark PROTRAK has been used since on or about 1988.   Koziel Aff'd at ¶ 2.  PROTRACK ADVANTAGE has been used since on or about 2001. Koziel Aff'd at ¶ 2.  ProTrak's products have been promoted widely.  Koziel Aff'd at 14. Protracker's former mark PROTRACKER SYSTEM was used commercially from on or about May 13, 1997.  Exhibit L; Mackensen Depo. at 20 - 21 and 100 - 101.  PROTRACKER

---

6  ProTrak's search, Exhibit R, was conducted in 1998, not 2006, and, aside from any other legal defect, thus does not show the renown of the mark.

SYSTEM is no longer used by Protracker.  Mackensen Depo at 142 - 145.  Protracker began actual use of PROTRACKER ADVANTAGE only on December 22 or 23, 2004.  Mackensen Depo. at 159 - 160.  Both companies have been noted in publications.  Exhibit X and Y. *Attrezzi, LLC*, 436 F.3d at 40.  In fact, Protracker came to ProTrak's attention by virtue of an article about Protracker.  Koziel depo at 15 - 16.

Annual revenue for ProTrak's products sold in connection with PROTRAK and now PROTRAK ADVANTAGE has been, on average, about 1.1 Million Dollars *per annum* over the course of the last nine years.  Koziel Affi'd. at 20.

Protracker argues that "Advantage" is descriptive and laudatory so that there are no inherent rights therein.  On the other hand, Protracker told the Patent and Trademark Office a different story when it attempted to register PROTRACKER ADVANTAGE.  In that different forum, Protracker argued that "Advantage" has distinguishing characteristics, meaning suggestive,[7] writing "[a]lso, the word 'advantage' gives the applicant's [Protracker's] mark a cutting-edge connotation.  One gets the impression that the applicant's software is for competitive, on-the-move businesses."  Exhibit Z at PSI0844.

The fact is that PROTRAK is not a word and has no meaning.  It is a fanciful or arbitrary mark, *see*, *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 210-211 (2000), which points toward the mark being a strong mark.  *See*, *2 McCarthy*, §11:83 at 11-167.  In any event, the

---

7  The initial inquiry in a trademark infringement case is whether the alleged mark is, in fact, a protectible trademark. *See, e.g.*, *Boston Beer Co. v. Slesar Bros. Brewing Co.*, 9 F.3d 175, 180 (1 Cir. 1993). "A court's inquiry into whether a term merits trademark protection starts with the classification of that term along the 'spectrum of distinctiveness.'" *Id*.  At one end of the spectrum lie generic terms, that is, "terms that have passed into common usage to identify a product." *Id*.  Such terms are  not protectible as trademarks.  *Id*.  Suggestive, arbitrary, and fanciful marks are considered inherently distinctive and thus entitled to trademark protection. "A term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of the goods.  *Equine Techs., Inc. v. Equitechnology, Inc.*, 68 F.3d 542, 544 (1st Cir. 1995).

mark is more than strong enough for PROTRACKER ADVANTAGE to be confused with

PROTRAK ADVANTAGE.  As the Examining Attorney states, before questioning the merits

of Protracker's evidence claiming the mark is weak:

> The applicant argues that the dominant portions of both marks are weak.
> However, even weak marks are entitled to trademark protection. [citation
> omitted].  In this instance, confusion is likely because the marks are substantially
> similar in sound, appearance and commercial impression and the goods are the
> same and the functions are the same or closely related.

Exhibit T at PSI0572.

The fact is that, after Protracker's application to register PROTRAK SYSTEM was

refused and the application was abandoned, Protracker could have avoided causing confusion by

more carefully investigating ProTrak's website or by calling ProTrak.  Instead, Protracker

adopted a new mark, PROTRACKER ADVANTAGE, which is extremely similar to ProTrak's

PROTRAK ADVANTAGE (as well as PROTRAK and PROTRAK INTERNATIONAL) for

use on goods that are similar and that are promoted and purchased by a marketplace which is

not, as Protracker asserts, limited to companies that service retail clients but, instead, also

includes companies that service institutional clients.  Within a short time after Protracker

adopted PROTRACKER ADVANTAGE, actual confusion occurred.  Such despite the fact that

Protracker is a tiny business.  The fact is that confusion is extremely likely to occur.

### V.  THE PROTRAK REGISTRATION HAS NOT BEEN SHOWN INVALID

Before addressing Protracker's arguments and evidence, it is first noted that Protracker

does not claim that ProTrak does not own PROTRAK or that ProTrak did not use PROTRAK

prior to the marks used by Protracker.  Rather, the only issue presented is that the rights

assigned by Marmen to ProTrak had been abandoned prior to the date of the assignment.  In

fact, ProTrak used PROTRAK beginning in 1988.  Koziel Aff'd at 2.  Protracker's claims under

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and under state/common law are not affected even if Protracker were to invalidate the registration.

Protracker asserts abandonment by Marmen before the assignment and that no good will was transferred to ProTrak.  Protracker has the burden of proof on its allegations.  Weight of the burden in summary judgment motions is determined with reference to the burden of proof at trial.  The moving party with burden of proof at trial must show no dispute as to all elements of case.  *See e.g. Mateo v. M.S. KISO*, 805 F.Supp. 761 (N.D. Cal 1991) (*Barefoot v. Mid-America Dairymen, Inc.*, 826 F.Supp. 1046 (N.D. Tex 1993); *Int'l. Ass'n. Of Heat and Frost Insulators and Asbestos Workers Local Union 42 v. Absolute Environmental Services Inc.*, 814 F.Supp. 392 (D.Del 1993).

Abandonment must be shown with clear and convincing evidence.  *Micromuse, Inc. v. Micromuse, Plc.*, 304 F. Supp. 2d 202, 216 (D. Mass. 2004).  To show abandonment, Protracker must show both that use of the mark had ceased and that the trademark owner had no intention to resume use of the trademark.  *Id*.  The lack of requisite intent may be "inferred from circumstances."  *Id*.

First, an examination of Protracker's evidence is in order.   The evidence contemporaneous with the time of the assignment includes no evidence by which it could be inferred that there was an intention for Marmen not to resume use of the trademark.  Moreover, Marmen executed an assignment.  Protracker Exhibit G.  The assignment includes a warranty that Marmen is sole owner of the registration and has full authority to assign it.  The assignment also states that the mark is assigned "together with the good will of the business ***in connection with which the mark is used***."   (Emphasis added).   Which is to say, the evidence contemporaneous  with the events does not show, with clear and convincing proof, either that

Marmen had ceased using the mark or, since the record is entirely silent on the issue, that Marmen intended not to resume use.

Protracker's post-event evidence consists of an affidavit by one Steven Le Boeuf, Protracker Exhibit K, whose signature appears on the assignment.  Protracker Exhibit G. In his affidavit, he confirms that, in fact, he told ProTrak's attorney *only* that Marmen previously stopped using the mark.  Nowhere in the affidavit does Mr. Le Beoef indicate when use of the mark ceased.  Rather, he asserts that use stopped and that "[w]hatever goodwill Marmen associated with the mark PROTRAK dissipated at the time Marmen stopped using the mark. Protracker Exhibit K at ¶ 6.  And he states that there was no intention to resume use but, then explains  "[s]ince stopping use of the mark PROTRAK, Marmen has not made any further use of the mark PROTRAK."

Assuming, *arguendo*, that these conclusory statements, made eight years after the fact, show abandonment with clear and convincing evidence, ProTrak's facts contradict Protracker's facts.  Contemporaneous with the time of the assignment, Protracker itself provided evidence to the Patent and Trademark Office which concerned Marmen's use of PROTRAK.  Exhibit S.[8] The very goods identified in Protracker Exhibit K (Le Boeuf Aff'd at ¶3) (political mailing list databases) as used in connection with PROTRAK, are described in information submitted to the Patent and Trademark Office by Protracker on April 28, 1998.  "The largest **involves** over 6 millions records on the Michigan state registered voter list **currently being managed** for the Michigan Republican party."  Exhibit S at PSI0752  (Emphasis added).  That same information

---

8  Interestingly, Protracker filed a Notice of Opposition, asserting that Sanyo's mark PRO TRAK is confusingly similar to PROTRACKER SYSTEM and, later, reached a settlement. Exhibit CCC.  Protracker did not attempt to cancel the registration on PROTRAK on the ground of abandonment or otherwise but, instead, initially submitted evidence regarding Marmen's business.  Exhibit S.  Moreover, Protracker submitted an appeal brief as well as a reply brief and a request to submit additional evidence.  Exhibits D, DD and EE.

was later obtained by ProTrak in a June 23, 1998 Dunn & Bradstreet report.   Exhibit Q.

Moreover, the search report obtained by ProTrak includes not only Marmen's registration on

PROTRAK but the mark appears in the common law section of the report. Exhibit R at

K0Z001295 (Common Law Use).    $750 was also paid by ProTrak to Marmen for the

assignment.  Koziel Aff'd at 8.

The reasonable inference to draw from ProTrak's evidence is either that Marmen had not

actually ceased making sales of the goods bearing the mark or that the goodwill had not

dissipated as of the time of the assignment.   "[G]oodwill does not ordinarily disappear or

completely lose its value completely overnight. Erosion from non-use is a gradual process."

*Defiance Button Machine Co. v. C & C Metal Products Corp.*, 759 F.2d 1053, 1060 (2d Cir.

1985).  Not only did Protracker not claim to the PTO that the mark had been abandoned, but it

submitted evidence as if the mark was in use.   ProTrak, moreover, around the same time

purchased rights in the mark and good will from Marmen.

Protracker, moreover, claims that no good will passed.  In fact, however, the assignment

states otherwise.  The assignment states that the mark is assigned "***together with the good will***

of the business in connection with which the mark is used."  Protracker Exhibit G.  (Emphasis

added).  That no tangible assets transferred is immaterial.  "But the transfer of goodwill requires

only that the services be sufficiently similar to prevent consumers of the service offered under

the mark from being 'misled from established associations with the mark.'"  *Visa, U.S.A., Inc. v.*

*Birmingham Trust Nat'l Bank*, 696 F.2d 1371, 1376 (Fed. Cir. 1982), *cert den.*, 464 U.S. 826,

104 S. Ct. 98, 78 L. Ed. 2D 104 (1983).  In this case, ProTrak continued in its business, namely,

database management system that manage directories.   Such is the business identified by

Marmen in its registration on PROTRAK that was the subject of the assignment.  In fact, the

PTO explained what could be expected to be found in a database management program:

> In fact, the applicant [Protracker] states its program "manages client data, such as telephone conversations, employee action item lists, client assets, names of other professionals that the client uses...names of relatives for wealth transfer planning...and so forth."  And in addition tracks names, prints address/telephone lists.  All of which can be part of a directory such as the registrant's program manages.

Exhibit B.

In short, it has not been shown, with clear and convincing evidence, that the registration is invalid.  Therefore, the registration is valid, incontestable and enforceable.

## VI.  THERE ARE FACTUAL DISPUTES REGARDING THE LACHES ALLEGATION

ProTrak notes, contradicting Protracker's facts, that Protracker no longer promotes or sells products in connection with the PROTRACKER SYSTEM mark.  Mackensen Depo at 142 – 145.  Rather, Protracker substantially upgraded the software and adopted a new mark, PROTRACKER ADVANTAGE.  Mackensen Depo 139 – 140.  Actual sales of products did not begin until December 22 or 23, 2004.  Mackensen Depo 159 – 160.  ProTrak, by counsel, sent a cease and desist letter to Protracker on or about June 24, 2005.  Exhibit W.  Negotiations then occurred.  Friedman Affidavit at 3.  The above-captioned matter was filed on September 29, 2005.

In the unlikely event that the above is insufficient basis to show that there is a dispute regarding the facts, ProTrak notes that laches is an equitable defense due to a party's inexcusable and unreasonable delay in bringing suit or taking action with respect to another's use of the party's trademarks and which causes undue prejudice to the afflicted party.  *Environmental Defense Fund v. Alexander*, 614 F.2d 474, 478 (5th Cir. 1980).  The doctrine of laches is however, not a hard and fast rule.  Rather, a court's analysis of a laches defense is undertaken in view of the formula "LACHES = DELAY x PREJUDICE", the variables by

necessity requiring a factual calculation by the trial court.  5 *McCarthy on Trademarks,* § 31.2.

Laches is an equitable defense, requiring the balancing of the equities, especially in light of the public interest in avoiding trademark confusion.  *Sara Lee Corp. v. Kayser-Roth Corp.,* 81 F.3d 455, 462 (4th Cir. 1996).  As a result, it is almost never an appropriate context for summary judgment.  Rather, laches can usually only be determined upon a complete trial on the merits "by a close scrutiny of the particular facts and a balancing of the respective equities of the parties, as well as of the general public".  *Country Floors, Inc. v. Gepner*, 930 F.2d 1056, 1066 (3d Cir. 1991) (quoting 2 J. Thomas McCarthy, *Trademarks and Unfair Competition* § 573 (2d ed. 1984)).[9]

Assuming, *arguendo* – and ProTrak's vehemently disagrees -, that Protracker's position that its use of PROTRACKER SYSTEM, a mark it no longer uses, is relevant, to laches, Protracker must show that ProTrak unreasonably delayed in filing suit or in taking action.  5 *McCarthy on Trademarks,* § 31.2.  Consequently, before delay in bringing suit can be accorded to the Plaintiff, obviously the Plaintiff must be aware of and/or have at least constructive, if not actual notice of the infringing mark.

Protracker's assertion that ProTrak knew early on comes from a search report.  ProTrak's facts, in contradiction, show – and Protracker appears to agree - that the search report was obtained in order to learn about Marmen.  In fact, ProTrak ordered a Dunn & Bradstreet report on Marmen and a search on PROTRAK on or about June 23, 1998, Exhibit R.; Wood Depo at

---

9  Delay in seeking relief may preclude monetary relief for past infringement, but, should not bar an injunction. *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403 (1916).  "As to laches and acquiescence, it has been repeatedly held, in cases where defendants acted fraudulently or with knowledge of plaintiff's rights, that relief by injunction would be accorded although an accounting of profits should be denied." *Id*. at 419 (citing *Daxlehner v. Eisner*, 179 U.S. 19, 39 (1900); *Menendez v. Hold*, 128 U.S. 514, 523 (1888); *McLean v. Fleming*, 96 U.S. 245, 257 (1878)).

26 – 27; Exhibit Q (Exhibit 6 to Wood Depo.).  As Protracker's Memorandum states: "In fact, Plaintiff used this search report to gather information about, Marmen Computing, Inc. (Marmen) who owned a trademark registration for the mark PROTRAK."  Protracker's Memo at 6. ProTrak's search report is a voluminous over 290 page document, with the PTO records alone revealing two hundred and thirty six (236) applications, along with thirteen state registrations and approximately two hundred (200) common law references and trade names.  Exhibit R.

One does not read search reports obtained for a specific purpose anymore than one reads the telephone book.  A mere list of names or marks does not constitute constructive notice for purposes of statute or equity.  *See e.g.*, *National Trailways Bus System v. Trailway Van Lines, Inc.*, F. Supp. 352 (Dist. Ct. E.D.N.Y. 1965) ("The Court does not infer from the listing, inserted in the local telephone directory in the Counties of Queens and Suffolk that plaintiff, or a member company had notice of defendant's use of the mark prior to 1959."  *Id.* At 359).  It is submitted that the appearance in the search of Protracker's application on PROTRAK SYSTEM does not constitute notice, constructive or otherwise, thereof by ProTrak.

Even if, *arguendo*, Protracker can show constructive notice, the First Circuit has held that the constructive notice of a defendant's federal registration does not start the time running on laches.  Instead, only the time of plaintiff's reasonable actual notice is relevant.  *Valmor Product Co. v. Standard Products Corp.*, 464 F.2d 200 (1 Cir. 1972).

> Citing 15 USC 1072, a provision declaring registration of a mark to be constructive notice thereof, appellant would have us charge Valmor with notice of the mark as of 1965, the year it was registered.  We are not persuaded.  While a statute of limitations might be thought to begin running upon constructive notice, by analogy to an undiscovered tort *cf. Clark v. Gulesian*, 429 F.2d 405 (1st Cir. 1970), the offense of infringement is a continuing one, and appellant has not suggested that the statue of limitations is a bar.  Laches, on the other hand, is an equitable doctrine which penalizes a litigant for negligent or willful failure to assert his rights, and is not appropriately applied here, where Valmor was unaware of the infringement…

*Id* at 204.   Similar to *Valmor*, in the present case ProTrak was unaware of the Defendant's infringing activities until late 2004.  Koziel Depo at 15-16.

Assuming, *arguendo*, that Protracker surmounts the notice hurdle, Protracker entirely overlooks that Protracker's activities could be construed by the trier of fact as being a knowing and deliberate infringement of ProTrak's rights.  If such finding were made, Protracker's laches defense would be barred by the doctrine of unclean hands.  Again, Protracker was on actual notice of ProTrak and its products.   The PROTRACKER SYSTEM application had been refused as early as 1998.  Notwithstanding the refusal, Protracker continued to use the mark that was confusingly similar to PROTRAK, in the expert view of the PTO.  Eventually, Protracker expressly abandoned the application and chose a new mark, which was actually first used commercially, only on or about December 22 or 23, 2004.  And that mark, PROTRACKER ADVANTAGE, is remarkably similar to PROTRAK ADVANTAGE, a mark which Protracker surely should have known about.  *See e.g.*,  *De Costa v. Columbia Broadcasting Systems, Inc*. 520 F 2d. 499, 514 (1st Cir. 1972) ("We do not find in the authorities sufficient support, where defendants' action was found by the jury to be deliberate and knowing, to invoke this doctrine.)

Assuming that Protracker survives all of the above hurdles, Protracker's claim would still fail due to the doctrine of progress encroachment.  The doctrine of progressive encroachment states that the senior user has no obligation to institute litigation until the defendant impacts on the plaintiff's goodwill and business.  *Profitness Physical Therapy Center v. Pro-Fit Orthopedic and Sports Physical Therapy P.C.*, 314 F.3d 62 (2d Cir 2002).   In *Profitness*, the District Court's summary judgment based on laches in favor of Defendant Pro-Fit was vacated on Appeal. 314 F.3d at 71.  The Court noted that the doctrine of progressive encroachment allows a Plaintiff "some latitude in the timing of its bringing suit", permitting it to "wait until the

likelihood of confusion looms large." *Profitness* at 70, citing *Kellogg*, 209 F.3d at 570-71 (quoting *Sara Lee*, 81 F. 3d at 462). "The primary rationale is that a plaintiff should not be obligated to sue until its right to protection has ripened such that plaintiff knew or should have known, not simply that the defendant was using the mark, but that plaintiff had a provable infringement claim against defendant." *Id*. at 70; *see also Kellogg*, 209 F.3d at 570-71." Any other rule would require each trademark owner to sue first and ask questions later, "and would foster meritless litigation." *Profitness* at 70, *citing*, *Kason*, 120 F.3d at 1206.

ProTracker Software Inc. commenced its operations in 1997 and for the first three years ran the business out of its president's house. Summary Judgement Exhibit A (at ¶ 9). The business has grown to include three (3) full time employees. Summary Judgement Exhibit A (at ¶ 2). Sales of ProTracker software have also slowly increased over this time. Mackensen depo [CONFIDENTIAL]; Exhibit I [CONFIDENTIAL]. While Protracker had been in business since 1997, likelihood of confusion began to loom large when Protracker began using PROTRACKER ADVANTAGE. At that point, information about Protracker came to ProTrak's attention, ProTrak sent a cease and desist letter, Exhibit W, and actual confusion occurred. *Supra* at 11 – 13.

Lastly, there is the important consideration that, in fact, Protracker has infringed ProTrak's rights. *See*, *supra* 6 – 16. Even if the court determines that there was a delay in the time period between the Plaintiff's actual knowledge of the Defendant's mark and related activities and the filing of litigation, denial of injunctive relief under the doctrine of laches is not consistent with a court's interest in protecting the public against confusion in the marketplace. *5 McCarthy on Trademarks* § 31.10. There is tremendous public interest in prevention of customer confusion which "militates against a finding of laches." *Donsky v. Bandwagon, Inc.,*

1976 Mass. Dist. Ct.; 193 U.S.P.Q. 336.  Even an unreasonable delay in filing suit is overcome

by a strong showing of the likelihood of confusion by the Plaintiff.  *ProFitness Therapy Center*

*v. Pro-Fit Orthopedic and Sports Physical Therapy P.C.*, 314 F.3d 62 (2d Cir 2002) ("Even

where laches and acquiescence would bar damages, moreover, a court may nonetheless grant

injunctive relief if it determines that the likelihood of confusion is so great that it outweighs the

effect of plaintiff's delay in bringing suit.").

## VII.   CONCLUSION

ProTrak prays that Protracker's motion be denied.  There are genuine issues of material

fact in dispute.

**PRO TRAK INTERNATIONAL, INC.**
By its attorneys,

Dated: <u>October 6, 2006</u>

<u>  /s/Neal E. Friedman, Esq.             </u>
Neal E. Friedman, Mass BBO No. 180210
 (admitted *pro hac vice*)
Michael J. Bujold, Esq. (0388)
DAVIS & BUJOLD, P.L.L.C.
112 Pleasant Street
Concord, New Hampshire 03301
Telephone: (603) 226-7490
Facsimile: (603) 226-7499
E-mail: patent@davisandbujold.com

**CERTIFICATE OF SERVICE**

I, Neal E. Friedman, hereby certify that a copy of the foregoing document and the
accompanying exhibits and documents were served electronically, through ECF, on Defendant's
attorney Teresa C. Tucker, GROSSMAN, TUCKER, PERREAULT & PFLEGER, PLLC, 55
South Commercial Street, Manchester, New Hampshire 03101 and on Defendant's attorneys
Mark K. Suri and Eric H. Weimers, Ryndak & Suri, LLP, 200 West Madison Street, Suite 2100,
Chicago, Illinois 60606, on this 6th day of October, 2006.

By: <u>   /s/Neal E. Friedman, Esq./   </u>
     Neal E. Friedman, Esq.
